1
2
3
4
5
6
7
8              UNITED STATES DISTRICT COURT
9            FOR THE EASTERN DISTRICT OF CALIFORNIA
10

11   YVONNE FOWKES,                         No.  2:15-cv-00546-KJM-CKD

12                    Plaintiff,

13          v.                              <u>ORDER</u>

14   METROPOLITAN LIFE INSURANCE
     COMPANY,
15
                     Defendant.
16
17

18          Plaintiff Yvonne Fowkes moves for summary judgment against Metropolitan Life

19   Insurance Company (MetLife), contending MetLife violated the Employee Retirement Income

20   Security Act (ERISA) when it denied her long-term disability (LTD) benefits claim.  MetLife

21   contends its denial posed no violation and also moves for summary judgment.  At hearing on the

22   cross-motions, David Allen appeared for Ms. Fowkes and Misty Murray appeared for MetLife.

23   As explained below, the court DENIES Ms. Fowkes's motion and GRANTS MetLife's cross-

24   motion.

25   I.      <u>PROCEDURAL HISTORY</u>

26          Ms. Fowkes filed a complaint against MetLife on March 11, 2015, challenging the

27   denial of her LTD claim under ERISA.  ECF No. 1.  After MetLife answered the complaint on

28   July 13, 2015, ECF No. 7, the parties agreed Ms. Fowkes's ERISA claim would be resolved

1    through cross-motions for summary judgment brought under Federal Rule of Civil Procedure 52,

2    ECF No. 16.  The parties filed their cross-motions on March 21, 2016, ECF Nos. 19, 20, and

3    oppositions to the cross-motions on April 4, 2016, ECF Nos. 22, 23.

4    II.     BACKGROUND

5            The material facts are reported in the administrative record and are undisputed.

6    *See Abatie v. Alta Health & Life Ins. Co.*, 458 F.3d 955, 970 (9th Cir. 2006) (district courts rely

7    on the administrative record in assessing an ERISA claim); *see also Harlick v. Blue Shield of*

8    *Cal.*, 686 F.3d 699, 706 (9th Cir. 2012) (in the ERISA context, "the usual tests of summary

9    judgment, such as whether a genuine dispute of material fact exists, do not apply.").

10           A.     MetLife Insurance Plan

11           On May 24, 1999, Ms. Fowkes started work with Vision Service Plan (VSP), an

12   eye care insurance company, as a customer service representative; she became a network

13   administrator in 2008.  AR 1718.  As an employee, Ms. Fowkes was entitled to short-term and

14   long-term disability income insurance benefits from MetLife, VSP's insurer and claims

15   administrator.  AR 2147.  On January 1, 2011, MetLife issued a Certificate of Insurance Plan

16   (Plan), a coverage plan that discussed the procedure for claiming disability benefits.  *Id.*  For

17   those seeking benefits, the Plan provided its definition of "disability" as follows:

18
19           Disability or Disabled means that as a result of Sickness or injury
             You are [either] Totally Disabled [or Partially Disabled].

20           Totally Disabled or Total Disability means:

21           During the Elimination Period and the next 24 months, You are
             unable to perform with reasonable continuity the Substantial and
22           Material Acts necessary to pursue Your Usual Occupation in the
             usual and customary way.

23           After such period, You are not able to engage with reasonable
             continuity in any occupation in which You could reasonably be
24           expected to perform satisfactorily in light of Your:

25           • age;

26           • education;

27           • training;

28           • experience;

2

1        • station in life; and

2        • physical and mental capacity

3        that exists within any of the following locations:

4        • a reasonable distance or travel time from Your residence in light
         of the commuting practices of Your community;

5

6        • a distance of travel time equivalent to the distance or travel time
         You traveled to work before becoming disabled; or

7        • the regional labor market, if You reside or resided prior to
         becoming disabled in a metropolitan area.

8

9   AR 2172 (brackets in original). "Elimination period," as discussed in the disability provision, is

10  defined as "the greater of the Short Term Disability Maximum Benefit Period or 180 Days."  AR

11  2166.  "Substantial and material acts," also discussed in the disability provision, are defined as

12  follows:

13       the important tasks, functions and operations generally required by
         employers from those engaged in Your Usual Occupation that
14       cannot be reasonably omitted or modified.

15       In determining what substantial and material acts are necessary to
         pursue Your Usual Occupation, We will first look at the specific
16       duties required by Your job.

17       If You are unable to perform one or more of these duties with
         reasonable continuity, We will then determine whether those duties
18       are customarily required of other employees engaged in Your Usual
         Occupation.

19

20  AR 2173.  "Usual occupation" is similarly discussed in the disability provision,

21  and is defined in part as

22       any employment, business, trade or profession and the Substantial
         and Material Acts of the occupation You were regularly performing
23       for the employer when the Disability began.  Usual Occupation is
         not necessarily limited to the specific job that You performed for
24       the employer.

25  *Id.*

26  /////

27  /////

28

                                3

1    The Plan also summarizes how an employee can support her disability claim:

2    If You become Disabled while insured, Proof of Disability must be
     sent to Us. When We receive such Proof, We will review the claim.
3

4    AR 2182. "Proof" is defined as follows:

5    Proof means Written evidence satisfactory to Us that a person has
     satisfied the conditions and requirements for any benefit described
6    in this certificate.  When a claim is made for any benefit described
     in this certificate, Proof must establish:
7
     • the nature and extent of the loss or condition;
8
     • Our obligation to pay the claim; and
9
     • the claimant's right to receive payment.
10

11   AR 2170.  Proof must be provided at the claimant's expense.  *Id.*  The claimant has the burden of

12   proof in substantiating his or her disability claim.  *Id.*

13        B.    Ms. Fowkes Leaves VSP

14        Ms. Fowkes's job as a network administrator included working with providers to

15   ensure compliance with VSP network criteria, evaluating a doctor's practices to determine if he or

16   she meets VSP criteria, and communicating with doctors and office staff through phone, fax, or

17   email regarding missing VSP network participation criteria information.  AR 1940.  She was

18   expected to work eight hours a day, mainly in a seated position, while handling "multiple tasks

19   and prioritz[ing] effectively."  AR 1940, 1965.  She ended her time with VSP on March 12, 2013,

20   when she was taken to the emergency room for chest pains and shortness of breath.  AR 1957,

21   1962, 1968.

22        C.    Ms. Fowkes Applies for Short-Term Disability

23             1.    Evidence Submitted

24        On April 4, 2013, less than a month after the last day she had worked, Ms. Fowkes

25   filed a claim for short-term disability benefits (STD) with MetLife.  AR 1958, 1968–1969.

26   Ms. Fowkes claimed she could not return to work until June 1, 2013, attributing her absence to

27   several conditions, including heart disease, shortness of breath, hypoglycemia, and a "full blown

28

4

1  flare up" of fibromyalgia, which caused her severe pain and confined her to bedrest.  AR 1968–

2  1969.

3          Shortly after filing her claim, MetLife's STD case manager Carolann Kolodziej

4  called Ms. Fowkes and directed her to complete and submit an attending physician statement, a

5  report by a treating doctor filed in support of a disability claim, to confirm her conditions.  AR

6  1969.  Ms. Fowkes agreed to submit a form after her visit with Dr. Gavin Pereira, her orthopedic

7  surgeon.  *Id.*  The record does not make clear whether Ms. Fowkes visited Dr. Pereira as planned.

8  Ms. Fowkes did, however, visit Dr. Gerson Stauber, her primary care physician, on March 27 and

9  April 2, 2013.  AR 1970.  During these visits, Dr. Stauber drafted office notes discussing Ms.

10  Fowkes's history of fibromyalgia,[1] hypoglycemia,[2] hypotension,[3] osteoarthritis,[4] and past

11  episodes of chest pain.  AR 1970–1971.  Dr. Stauber also noted Ms. Fowkes was suffering from

12  diarrhea and was preparing for a left knee replacement surgery.  *Id.*  Ms. Fowkes submitted these

13  office notes to the STD case manager, *id.*, along with an attending physician statement confirming

14  her conditions of fibromyalgia and hypoglycemia, AR 57.  She also submitted an attending

15  physician statement supporting an osteoarthritis diagnosis.  *Id.*  The physician statements

16  discussed Ms. Fowkes's restrictions and limitations, stating Ms. Fowkes could sit for two hours,

17  _____

18  [1] Fibromyalgia is a condition with symptoms most commonly characterized by
   widespread pain, fatigue, and sleep disturbance.  99 Am. Jur. Proof of Facts 3d 1 (originally

19  published 2008).  The diagnosis of fibromyalgia requires a history of at least three months of
   widespread pain, and pain and tenderness in at least 11 of 18 tender point sites. The tender point

20  sites include the fibrous tissue or muscles of the neck, shoulders, chest, rib cage, lower back,
   thighs, knees, arms (elbows), and buttocks.  *Id.*

21
22  [2] Hypoglycemia is defined as low blood glucose level that destabilizes energy production.
   American Law of Medical Malpractice § 14:10 (3rd ed. 2016).  The brain is dependent upon an
   adequate level of circulating glucose and requires a constant supply to support energy consuming

23  cerebral activity.  *Id.*

24  [3] Hypotension or low blood pressure is a condition that can cause dizziness or fainting

25  spells.  Maryland Practice: DUI Handbook § 10:7 (2016 ed.).

26  [4] Osteoarthritis is the most common form of chronic arthritis. It is a degenerative disease
   of the articular cartilage in joints . It affects primarily the joints of the hip, knee, spine and hands

27  causing pain, stiffness, deformity and decreased range of motion.  Attorneys Medical Deskbook
   § 24:19 (2016 ed.).

28

1  stand for an hour, walk for an hour, and lift up to twenty pounds.  *Id.*  The statements also noted,

2  however, Ms. Fowkes could not work due to chronic pain.  *Id.*

3  2. <u>MetLife Denies STD Application</u>

4  On April 11, 2013, MetLife denied Ms. Fowkes's STD claim, concluding the

5  evidence submitted did not support a finding of disability as defined by the Plan.  AR 1971–1972.

6  In particular, the case manager noted, "[b]ased on medical information reviewed, there is not any

7  particular illness that substantiates time [out of work]."  AR 1972.  The case manager did note,

8  however, Ms. Fowkes's claim could be reviewed again if she submitted information verifying her

9  left-knee replacement surgery.  *Id.*  Ms. Fowkes received a copy of her denial letter from MetLife

10  on April 23, 2013.  AR 1974.

11  3. <u>MetLife Revisits Claim and Approves STD</u>

12  On July 15, 2013, MetLife received information verifying Ms. Fowkes's left-knee

13  replacement surgery, which had occurred on April 30, 2013, and documentation supporting a

14  right-knee replacement surgery, which had occurred on June 30, 2013.  AR 1978.  MetLife

15  approved Ms. Fowkes's STD claim and granted retroactive benefits from March 12, 2013,

16  Ms. Fowkes's last day of work, to August 16, 2013.  *Id.*

17  D. <u>Ms. Fowkes Applies for Long-Term Disability</u>

18  1. <u>Disabilities Claimed</u>

19  On August 13, 2013, while still off work, Ms. Fowkes filed her claim for LTD

20  benefits.  AR 1982, 1986.  MetLife initiated the claims process through a phone interview with

21  Ms. Fowkes on August 22, 2013, first inquiring about the conditions supporting her claim.

22  AR 1999.  Ms. Fowkes stated she could not work because of fibromyalgia, chronic epileptic

23  seizures, frequent chest pain, dizziness, issues with her coronary artery, and an inability to walk

24  due to her knee-replacement surgeries.  *Id.;* AR 2000, 2004.  MetLife then asked Ms. Fowkes if

25  there were any aspects of the job she was able to complete, her conditions notwithstanding.

26  AR 2004.  Ms. Fowkes stated she could sit at a desk and answer phones for short periods of time.

27  *Id.*

28

6

2.      Evidence Submitted

The same day MetLife interviewed Ms. Fowkes, it received office notes from several of Ms. Fowkes's doctors: (1) Dr. John Luke, who replaced Dr. Stauber as Ms. Fowkes's primary care physician; (2) Dr. Nander Bukkapatnum, Ms. Fowkes's cardiologist; and (3) Dr. Andrew Oh, Ms. Fowkes's neurologist.  AR 2000–2001.  In support of the LTD claim, Dr. Luke filed office notes from Ms. Fowkes's visit in August 8, 2013, in which he discussed Ms. Fowkes's dizziness when walking, frequent chest paints, at least four heart attacks from 2006 to 2009, and a stroke in 2006.  *Id.*  Dr. Bukkapatnum, who saw Ms. Fowkes on August 1, 2013, submitted notes discussing Ms. Fowkes's pacemaker installed in 2012, her shortness of breath, and her chest pains.  *Id.*  Dr. Oh, who saw Ms. Fowkes on August 22, 2013, submitted notes discussing her uncontrollable epileptic seizures.  AR 2002.  Dr. Oh noted her seizures occurred several times a day and became so uncontrollable that her driver's license had to be revoked.  *Id.* He recommended MetLife find Ms. Fowkes totally disabled.  *Id.*

On August 22, 2013, MetLife directed Ms. Fowkes to complete and file attending physician statements to confirm her conditions, and Ms. Fowkes agreed to do so.  AR 2006.  The next day, MetLife sent a fax to UC Davis, where Ms. Fowkes's physicians worked, to obtain additional medical records, including additional office visit notes from Dr. Luke, Dr. Bukkapatnam, and Dr. Oh.  AR 2009.  MetLife also faxed Ms. Fowkes's orthopedic surgeon, Dr. Pereira, to ask for visit notes from an August 2013 meeting, a month after Ms. Fowkes's right-knee replacement surgery.  AR 2009–2010.

On September 4, 2013, Dr. Pereira submitted office visit notes to MetLife, reporting Ms. Fowkes had a good range of motion but throbbing pain on her lateral side.  AR 2018.  Dr. Pereira noted full recovery was likely in eight weeks, and Ms. Fowkes would then no longer need orthopedic services.  AR 2013.  The record does not make clear whether Ms. Fowkes's other doctors submitted office notes.  *See* AR 2013–2018.

3.      MetLife Extends STD Benefits While Reviewing LTD Claim

As noted above, Ms. Fowkes was out of work and on short-term disability when she filed her LTD claim.  AR 1982.  While her LTD claim was pending, MetLife submitted Ms.

7

1   Fowkes's STD claim to internal nurse consultant Karen Manley to determine if STD benefits

2   should be extended.  AR 2010–11.  In particular, MetLife asked nurse consultant Manley to

3   review the evidence Ms. Fowkes submitted in support of her STD and LTD claims, in addition to

4   any notes taken from the March 12, 2013 emergency room visit, to determine how long Ms.

5   Fowkes should be in recovery and if she could plausibly be expected to return to work and when.

6   *Id.*  In short, MetLife asked its nurse consultant if Ms. Fowkes's condition was severe enough to

7   keep her from working.  *Id.*

8           On September 4, 2013, nurse consultant Manley reviewed the evidence and

9   concluded despite Ms. Fowkes's multiple diagnoses, including fibromyalgia and seizures, she

10   could not establish disability, because the conditions were not supported by "medical from the

11   treating provider(s)."  AR 2013 (verbatim transcription).  Before determining whether Ms.

12   Fowkes could return to work, nurse consultant Manley recommended MetLife request Ms.

13   Fowkes file a Restriction and Limitation Form (R&L) from each of her health care providers to

14   determine if Ms. Fowkes was precluded from completing the tasks of her position.  AR 2013–

15   2014.  In accordance with the nurse consultant's request, on September 5, MetLife requested Ms.

16   Fowkes submit R&L forms from her health care providers.  AR 2016.  While waiting on the

17   forms, MetLife referred Ms. Fowkes's case to internal claims support specialist Bonnie Levy to

18   determine if her STD benefits could be extended from August 17, 2013 to September 16, 2013,

19   the maximum benefits period date.  AR 2012.  Claims support specialist Levy concluded STD

20   should be extended to September 16, 2013, noting Ms. Fowkes submitted records showing she

21   had throbbing pain from prolonged recovery of her left knee.  AR 2019.  MetLife notified Ms.

22   Fowkes of the STD decision on September 11, 2013.  *Id.*

23           4.   MetLife Requests More Evidence to Support LTD Claim

24           On September 17, 2013, MetLife followed up with Ms. Fowkes regarding her

25   LTD claim, again asking for R&L forms from Dr. Pereira, Dr. Stauber, and Dr. Oh to determine

26   her restrictions and level of functionality.  AR 2023–2025.  After informing MetLife that

27   Dr. Luke replaced Dr. Stauber as her primary care physician, AR 2024, Ms. Fowkes agreed to

28   have the forms completed and submitted, AR 2025.  On September 25, 2013, Dr. Oh sent an

1   attending physician statement to MetLife, in which he diagnosed Ms. Fowkes with temporal lobe

2   epilepsy.  AR 2026.  In the statement, Dr. Oh noted that although Ms. Fowkes had no restrictions

3   or limitations, she had no capacity to work due to her seizures.  *Id.*  Dr. Oh also noted an

4   electroencephalogram (EEG)[5] showed "left temporal lobe epileptic discharge," *id.*, but she was

5   able to "function under stress and engage in interpersonal relations with no limitations,"

6   AR 1724.  It is undisputed a copy of the EEG report was not provided with the attending

7   physician statement.  *See id.*; AR 1726.

8          That same day, Dr. Bukkapatnum submitted an attending physician statement

9   noting Ms. Fowkes could sit, stand, and walk intermittently for one hour, AR 2026, could operate

10  a motor vehicle, AR 1714, and was able to function in most stress situations and engage in some

11  interpersonal relations, *id*.  Dr. Bukkapatnum noted, however, that Ms. Fowkes could not carry

12  over twenty pounds and had "zero work capacity."  *Id.*  MetLife did not receive a response from

13  Dr. Pereira until October 8, 2013, when he noted Ms. Fowkes was no longer under his care.

14  AR 2028.  Dr. Pereira did note, however, that Ms. Fowkes's right knee was "doing well except

15  for scar tissue stitch, which will be resolved in the next 3–6 months."  AR 2028.  Dr. Pereira did

16  not provide any R&L forms.  *Id.*

17         On October 30, 2013, after reviewing office visit notes and documents received

18  from Ms. Fowkes's doctors, MetLife called to inform Ms. Fowkes it needed medical records

19  beginning March 12, 2013, the day she started her STD benefits.  AR 2029–2031.  MetLife also

20  informed Ms. Fowkes it had received attending physician statements from Dr. Bukkapatnum and

21  Dr. Oh, but not from Dr. Stauber or Dr. Pereira.  AR 2031–2032.  In response, Ms. Fowkes

22  explained Dr. Stauber was no longer her primary care physician, AR 2032, and Dr. Pereira was

23  no longer her doctor after September 16, 2013, AR 2031–2032, which also was the last day of her

24  STD benefits coverage.  Additionally, Ms. Fowkes stated she no longer claimed disability due to

25

26         [5] An electroencephalogram, or EEG, is a test that detects electrical activity in the brain
    using small, flat metal discs (electrodes) attached to the scalp.  This activity shows up as wavy
27  lines on an EEG recording.  An EEG is one of the main diagnostic tests for epilepsy.  *See*
    Dortland's Illustrated Medical Dictionary 536 (27th ed. 1988).

28

1    her knees but continued to claim disability due to epilepsy and a heart condition.  AR 2032.  At

2    the same time, Ms. Fowkes did not claim a disability due to fibromyalgia.  *See* AR 2031–2032.

3    Ms. Fowkes agreed to submit medical records from March 2013 onward.  AR 2032.

4            On November 14, 2013, MetLife again referred Ms. Fowkes's case to nurse

5    consultant Manley to determine if Ms. Fowkes had adequately supported an LTD claim based on

6    epileptic seizures and a heart condition, or alternatively, what documents would be needed to

7    support her LTD claim.  AR 2037–2039.  On November 27, 2013, the nurse consultant Manley

8    completed review, AR 2039, and summarized the contents of Ms. Fowkes's claim files, AR 2041,

9    including documents supporting both her STD and LTD claims.  The records supporting Ms.

10   Fowkes's STD claim included (1) office visit notes from Dr. Pereira discussing Ms. Fowkes's

11   left-knee replacement surgery, *id.*, (2) an attending physician statement from Dr. Bukkapatnum

12   discussing a cardiac diagnosis of sick sinus syndrome[6] and diastolic dysfunction[7], *id.*, and (3) an

13   attending physician statement from Dr. Oh discussing a neurological diagnosis of temporal lobe

14   epilepsy, *id.*  The records supporting Ms. Fowkes's LTD claim included (1) the September 25,

15   2013 attending physician statement from Dr. Oh discussing the epilepsy diagnosis, *id.*, (2) the

16   September 25, 2013 attending physician statement from Dr. Bukkapatnum discussing

17   Ms. Fowkes's restrictions and limitations, *id.*, and (3) the October 8, 2013 office visit note from

18   Dr. Pereira discussing the end of orthopedic treatment and Ms. Fowkes's period of recovery

19   following her knee surgeries, *id.*

20           On November 27, 2013, after reviewing the records Ms. Fowkes submitted in

21   support of her STD and LTD claims, MetLife's nurse consultant Manley concluded Ms. Fowkes

22   did not provide "objective evidence . . . from . . . providers to support that she would be unable to

23

24           [6] Sick sinus syndrome is a condition with symptoms ranging from dizziness to
     unconsciousness due to chaotic or absent activity in the upper chamber of the heart, also known
25   as the atria.  Stedmans Medical Dictionary  882040 (2014 ed.).

26           [7] Diastolic dysfunction is a condition in which the ventricle walls of the heart do not
     properly relax and thereby become rigid, preventing the walls from filling with blood.  *See*
27   Christine Stewart, MD & Betty Brutman, MD, JD, Attorneys Medical Advisor (2016), *available
     at* 8 Attorneys Medical Advisor § 89:38 (Westlaw).

28

1  perform her job duties." AR 2042.  Nurse consultant Manley found several additional records

2  were needed, including Dr. Oh's medical and office notes from the day he diagnosed her with

3  epilepsy. *Id.* Nurse consultant Manley noted "EEG results also would be beneficial," *id.,* and

4  found MetLife would also need Dr. Bukkapatnum's medical and office notes that show

5  "pacemaker checks, symptomology," and cardiac catheterization reports to support Ms. Fowkes's

6  diagnosis of diastolic dysfunction.  AR 2042.

7       On December 12, 2013, MetLife again referred Ms. Fowkes's file to nurse

8  consultant Manley to determine if there was enough information to support a disability claim.

9  AR 2047.  After reviewing the record, nurse consultant Manley concluded there was "no

10  objective evidence provided from any of the above health care providers, cardiology or

11  neurology, this [] includes a lack of office visit exam findings, symptoms, diagnostics, or

12  treatment plan." AR 2052–53.  In particular, the "medical[s] provided" did not substantiate Ms.

13  Fowkes's disability claims due to temporal lobe epilepsy, sick sinus syndrome, periventricular

14  beats and diastolic dysfunction.  AR 2051.  As for Ms. Fowkes's other diagnoses, including

15  fibromyalgia, nurse consultant Manley concluded there was "no medical submitted to indicate

16  this or how this impacts her disability." AR 2052.  From the "limited" medical records on file,

17  nurse consultant Manley concluded she "could not see why claimant could not return to work in

18  her previous capacity as claimant has had the above diagnosis of seizures since 2008." AR 2051–

19  55.  In short, nurse consultant Manley agreed with her prior finding that Ms. Fowkes's file did not

20  substantiate her claim of disability, and informed MetLife Ms. Fowkes would need "medical[s]

21  . . . includ[ing] [o]ffice visit notes with exam findings [and] diagnostic findings supporting the

22  diagnosis submitted." *Id.*  Based on nurse consultant Manley's findings, MetLife concluded

23  Ms. Fowkes did not have enough evidence "demonstrating the functional impairments provided

24  that would support [Ms. Fowkes's] inability to perform her sedentary job duties." AR 2060.

25  /////

26  /////

27  /////

28  /////

1   On December 13, 2013, MetLife sent an LTD claim status letter to Ms. Fowkes,

2 discussing the information needed to support her claim:

> The information needed includes office visit notes, diagnostic test reports, therapy notes and evaluations, procedure reports, hospital admission and discharge summaries, and other medical information which will support your claim for disability.

6 AR 1637, 2046.  MetLife informed Ms. Fowkes it had requested these records in prior letters sent

7 on September 17, 2013, September 25, 2013, October 17, 2013, and November 14, 2013, and that

8 the requested information was due December 15, 2013.  AR 2046.

9   On December 16, 2013, after the scheduled deadline for submitting the additional

10 medical records had passed, Ms. Fowkes called MetLife to say she was still trying to obtain her

11 medical records.  AR 2063–64.  MetLife informed Ms. Fowkes that if it received no medical

12 records, a final decision would be made soon.  *Id.*

13     5. MetLife Denies LTD Claim

14   On December 17, 2013, Ms. Fowkes sent MetLife office notes, medical diagnoses,

15 and lab reports from Dr. Oh, Dr. Luke, Dr. Bukkapatnum, and Dr. Pereira.  AR 1345–1636, 2068.

16 After receiving the additional medical information, MetLife referred Ms. Fowkes's file to internal

17 nurse consultant Debra Cwik to determine if nurse consultant Manley's assessment should be

18 changed.  AR 2070.  That same day, after noting the additional medical records consisted of

19 "labs," Cwik as the new nurse consultant concluded the prior consultant's conclusion would not

20 be changed.  *Id.*  To support her finding, nurse consultant Cwik relied on records showing Ms.

21 Fowkes's recovery from her knee surgery.  *Id.*  Further, she concluded there were no notes from

22 Ms. Fowkes's cardiologist, rheumatologist, or neurologist to support a finding of disability due to

23 cardiac issues, fibromyalgia, or epilepsy.  *Id.*

24   The nurse consultant concluded that to support a claim of disability due to cardiac

25 issues, Ms. Fowkes would have to submit among other things an echocardiogram report, cardiac

26 catheterization reports, and pacemaker checks to substantiate a diagnosis of sick sinus syndrome.

27 AR 2071.  To support a claim of disability due to fibromyalgia, Ms. Fowkes would have to

28

1    submit office visit notes from her rheumatologist with a list of positive "trigger points."[8]  *Id.*  To

2    support a claim of disability due to epilepsy, Ms. Fowkes would have to submit office notes with

3    EEG reports showing seizure activity.  *Id.*

4                On December 18, 2013, Dr. Luke submitted office notes to MetLife, noting that a

5    cardiac catheterization from September 2012 showed normal coronaries but displayed evidence of

6    diastolic dysfunction.  AR 2072.  Based on a September 2008 MRI of the brain without contrast,

7    Dr. Luke noted the results were within "normal limit[s]."  *Id.*  No other test results were

8    submitted, including an EEG, rheumatology reports, positive cardiac catheterization reports, or

9    positive MRIs to support heart conditions or epileptic seizures.  AR 2072.

10               On December 19, 2013, MetLife denied Ms. Fowkes's LTD claim.  AR 2075.

11        E.    Ms. Fowkes Appeals the LTD Denial

12               On June 18, 2014, Ms. Fowkes, through her attorney, appealed MetLife's LTD

13   claim denial.  AR 1276, 2080.  In support of her appeal, Ms. Fowkes provided a letter from Dr.

14   Oh dated March 31, 2014, and a letter from Dr. Bukkapatnum dated April 3, 2014.  AR 1309,

15   2086.  In his letter, Dr. Oh reported Ms. Fowkes had been treated within the UC Davis Health

16   System for the last six years because of her seizures.  AR 1309.  He noted it was uncertain

17   whether the "origin of the seizures is epileptic or non-epileptic . . .  and further diagnostic studies

18   are planned."  *Id.*  No laboratory or medical tests were attached to the letter.  *See id.*  The letter

19   from Dr. Bukkapatnum stated Ms. Fowkes was under his care for complex cardiovascular issues.

20   AR 1310.  In the letter, Dr. Bukkapatnum stated Ms. Fowkes has "severe diastolic dysfunction,

21   orthostatic hypotension, [and] sick sinus syndrome with a pacemaker."  *Id.*  As with Dr. Oh's

22   letter, Dr. Bukkapatnum did not attach laboratory or medical test results.  *See id.*  In addition to

23   the letters, Ms. Fowkes submitted 999 pages of medical records from the UC Davis Health

24   System, which included office notes, laboratory reports, medication logs, radiology reports, lists

25

26          [8] Trigger points are sites that become tender during a fibromyalgia flare-up, which is a
     syndrome of chronic, widespread musculoskeletal pain.  *See* Mikel A. Rothenberg, M.D.,

27   Preparing Orthopedic Disability Cases (2006), *available at* §6.01 FIBROMYALGIA, PORDC
     §6.01 (Westlaw).

28

1    of diagnoses, and medical history reports from Ms. Fowkes's primary care, neurology,

2    cardiology, orthopedic, and pain management doctors from 2010 through April 2014.  AR 2086.

3              MetLife followed up with Ms. Fowkes's lawyer on July 21, 2014.  AR 2095–2096.

4    With Ms. Fowkes's lawyer, MetLife confirmed her position that the following conditions

5    impacted her functioning: (1) osteoarthritis, (2) congenital heart failure, (3) epilepsy with

6    resulting seizures, (4) right hand tremors, and (5) fibromyalgia.  AR 2096.  When MetLife asked

7    about her depression, Ms. Fowkes's lawyer stated her depression was likely due to her several

8    physical conditions, was not disabling her, was not being treated, and did not need to be

9    addressed on appeal.  AR 2097.  Lastly, MetLife confirmed Ms. Fowkes's health care providers

10   were Dr. Oh, Dr. Pereira, Dr. Luke, and Dr. Bukkapatnum.  *Id.*

11                    1.    MetLife Refers File to Appeals Nurse Consultant

12             On July 21, 2014, MetLife sent Ms. Fowkes's appeal file, including her attorney

13   letters, records of discussions with her lawyer, and medical records to internal appeals nurse

14   consultant Nancy Brasefield.  AR 2099.  Appeals nurse consultant Brasefield reviewed the

15   materials in Ms. Fowkes's file, which included the materials submitted in support of her initial

16   LTD claim and the additional materials submitted in support of her appeal.  AR 2100–2124.  On

17   August 1, 2014, appeals nurse consultant Brasefield completed the review and made several

18   findings regarding Ms. Fowkes's conditions.  AR 2101.

19             Regarding osteoarthritis, appeals nurse consultant Brasefield noted Ms. Fowkes's

20   last follow-up with orthopedic surgeon Dr. Pereira was on September 23, 2013, at which point he

21   stated no further treatment was needed.  AR 2119.  Regarding her heart conditions, appeals nurse

22   consultant Brasefield noted her pacemaker was installed in June 2012 to take care of sick sinus

23   syndrome, well before Ms. Fowkes began to claim disability.  AR 2120.  Her other heart

24   conditions, including congenital heart failure, were not supported by "clinical exam findings."

25   AR 2123.  Regarding Ms. Fowkes's epileptic seizures and right hand tremors, the most recent

26   EEG exam, completed on November 1, 2013, reflected several shaking behaviors but no

27   "electroencephalographic correlation," suggesting the seizures were not induced by epilepsy.  AR

28   2120.  Regarding fibromyalgia, nurse clinician Brasefield noted Ms. Fowkes's file contained one

1   report from 2011 showing positive findings of fibromyalgia, but this report was made while Ms.

2   Fowkes worked for VSP, and no recent clinical evidence or exam supported a current flare-up of

3   fibromyalgia.  AR 2123.  In the end, appeals nurse consultant Brasefield concluded it was

4   "unclear" whether the evidence Ms. Fowkes provided substantiated her claims for disability.  AR

5   2122–2123.

6          2.      MetLife Refers Claim to Outside Medical Consultant

7          MetLife next sent Ms. Fowkes's file to Dr. Arousiak Varpetian, a board certified

8   neurologist and independent physician consultant for an independent third party review.  AR 66.

9   MetLife asked Dr. Varpetian if the physical conditions "alone, or in combination, support [Ms.

10  Fowkes's disability claim]."  AR 77.  MetLife also asked Dr. Varpetian to describe the clinical

11  findings that supported Ms. Fowkes's functional limitations.  Id.  Dr. Varpetian reviewed Ms.

12  Fowkes's appeal file, including notes, labs, and reports from her doctor's visits from 2010 to

13  2014, and concluded "the documentation does not support continuous functional impairment."

14  AR 63.

15         Regarding her osteoarthritis, Dr. Varpetian found Ms. Fowkes was "able to walk

16  and took medication for the pain."  AR 64.  He concluded, "there is no documentation in the notes

17  from the orthopedic surgeons that claimant was impaired from daily routine walking or activities

18  of daily living.  No restrictions or limitations were recommended due to bilateral knee surgery in

19  the post-operative period and thereafter."  Id.  Regarding her heart conditions, Dr. Varpetian

20  reviewed office notes and laboratory reports from her March 2013 emergency room visit, and her

21  visits with Dr. Bukkapatnum to determine if Ms. Fowkes was disabled due to "chest pain,

22  orthostatic hypotension, diastolic dysfunction, and sick sinus syndrome."  AR 63.  He found

23  Ms. Fowkes had an extensive cardiac evaluation and was found to have "normal coronary arteries

24  and systolic function."  Id.  Dr. Varpetian also concluded Ms. Fowkes's "cardiac function was

25  well compensated and no impairment was found due to her cardiac condition."  AR 64.  In sum,

26  Dr. Varpetian concluded "the records do not support any restrictions or limitations due to

27  claimant's cardiac diagnosis other than not working overhead with the left arm because of the

28  pacemaker."  Id.  Regarding her epilepsy and resulting seizures and tremors, Dr. Varpetian

1  studied the results of the 48–hour ambulatory EEG monitoring test Ms. Fowkes underwent on

2  November 1, 2013 to determine if her seizures were caused by epilepsy.  *Id.*  According to the

3  EEG, Ms. Fowkes's seizures were "non-epileptic" in nature.  *Id.*  As to her hand tremor,

4  Dr. Varpetian observed examination results were "inconsistent, with tremor appearing during

5  examination and not other times."  *Id.*  Regarding the tremors, Dr. Varpetian observed, "no

6  neurological examination is evident from the records."  *Id.*  Overall, Dr. Varpetian concluded

7  Ms. Fowkes's "reports of seizure-like activities are not neurological in nature and don't warrant

8  any restrictions or limitations from [the] neurological perspective."  AR 65.  Regarding her

9  fibromyalgia, Dr. Varpetian found Ms. Fowkes was evaluated by two different rheumatologists

10  and "no impairment was noted due to the subjective complaints of pain."  AR 64.  The progress

11  notes from various providers "showed the claimant in no distress despite complaining of severe

12  diffuse pain."  AR 17.  Based on his findings, Dr. Varpetian concluded "there is no subjective or

13  objective evidence in the reports to support restrictions or limitations from full time work due to

14  pain."  AR 64.  Ms. Fowkes also claimed disability due to constant migraines.  *Id.*  The doctor

15  noted she made complaints of migraines on December 13, 2010 in the hospital emergency

16  department, AR 47, on November 1, 2013 with Dr. Luke, AR 60, and on April 26, 2014 also with

17  Dr. Luke, AR 64.  He noted the complaints did not cause long-term difficulties.  *Id.*

18         In sum, Dr. Varpetian found Ms. Fowkes's disability appeal was not supported by

19  her evidence.  AR 45–64.  He concluded she was not disabled under the terms of the Plan.

20  AR 2135.

21              3.      MetLife Confirms LTD Denial

22         On September 16, 2014, MetLife sent Dr. Varpetian's report to Doctors

23  Bukkapatnum, Pereira, Oh, and Ms. Fowkes's attorney, AR 2136, and allowed fourteen days for

24  any responses, *id.*  By October 1, 2014, MetLife had not received any response from

25  Ms. Fowkes's doctors or attorney.  *Id.*  MetLife confirmed Ms. Fowkes's LTD claim denial that

26  same day.  AR 2137.  MetLife informed Ms. Fowkes and her attorney of the denial by letter to

27  her attorney, which stated in part,

28

16

1

2

> [W]e have taken into consideration all the information that was provided by you, Ms. Fowkes, and her treating physicians.

3

> In making our determination, we acknowledged and considered the records provided in which you felt establish that Ms. Fowkes was unable to work due to her uncontrolled epilepsy, total knee replacement and revision, and cardiac condition, along with right hand tremor, and cognitive issues due to her medical conditions.

4

5

6

> However the determination of disability is not solely based on diagnoses, but on functional capabilities related to symptoms and substantiated by clinical findings.

7

8

> Our review, which included a Board Certified [Independent Physician Consultant], who spoke with Ms. Fowkes['s] treating providers, found there was insufficient clinical evidence to support a severity of Ms. Fowkes['s] medical conditions that would support a continuous impairment or would prevent Ms. Fowkes from performing her own job, or usual occupation from March 12, 2013 forward.

9

10

11

> . . .

12

> Therefore, Ms. Fowkes did not meet the Definition of Disability and the original decision to deny her LTD benefit was appropriate, and benefits will remain denied.

13

14

15   AR 2137–2142.  Because Ms. Fowkes had exhausted her administrative remedies under the Plan,

16   "no further appeals w[ould] be considered" by MetLife.  AR 2137–2130.

17         F.    <u>Documents Submitted After MetLife Appeal and Final Denial</u>

18         On October 16, 2014, Ms. Fowkes's attorney responded to MetLife's denial letter

19   with additional records to support Ms. Fowkes's disability claim.  AR 2144.  He faxed a complete

20   medical report from social worker Maatisak Amenhetep, which evaluated Ms. Fowkes's mental

21   and emotional capabilities.  AR 3–7.  Social worker Amenhetep noted Ms. Fowkes was in a

22   critical mental health state and had a "poor" capacity to maintain attention and concentration and

23   to interact with supervisors.  AR 5.  In sum, social worker Amenhetep concluded Ms. Fowkes

24   was "totally unable to work" because she suffered from "severe post-traumatic stress disorder."

25   AR 8.

26         While the record does not make clear whether supporting evidence was submitted,

27   Ms. Fowkes also contends that on February 24, 2015, the Social Security Administration (SSA)

28

1 │ found her to be disabled with an onset date of March 12, 2013.  *See* Pl.'s Mot. at 11, ECF

2 │ No. 19-1.

3 │ III.      DISCUSSION

4 │            Ms. Fowkes argues she is disabled as defined under the terms of the Plan due to

5 │ the following conditions: (1) osteoarthritis; (2) epilepsy; (3) a "heart condition"; (4) fibromyalgia;

6 │ (5) migraine headaches and neck pain; (6) right hand tremors; (7) memory loss; and

7 │ (8) depression.  Pl.'s Mot. at 9.  MetLife argues that despite Ms. Fowkes's several diagnoses, she

8 │ is not disabled under the terms of the Plan because she did not provide evidence showing she was

9 │ precluded from performing the "substantial and material duties of her sedentary occupation."

10 │ Def.'s Mot. at 6, ECF No. 20.

11 │            Below, the court discusses the standard governing the ERISA cross-claims, the

12 │ propriety of considering evidence submitted after MetLife's appeal denial, and the merits of the

13 │ parties' cross-claims.  As explained in more detail below, the court reviews the cross-claims

14 │ under a *de novo* standard, does not consider documents submitted after MetLife's appeal denial,

15 │ and concludes Ms. Fowkes has not established disability under the terms of the Plan.

16 │        A.      Legal Standards

17 │            1.      ERISA Generally

18 │            ERISA provides claimants with a federal cause of action to recover benefits due

19 │ under an ERISA plan.  29 U.S.C. § 1132(a)(1)(B).  Under Rule 52(a) of the Federal Rules of Civil

20 │ Procedure, each of the parties moves for judgment in its favor on the ERISA claim, and the court

21 │ conducts what is essentially a bench proceeding based on the record, evaluating the

22 │ persuasiveness of conflicting testimony and deciding which is more likely true.  *Kearney v.*

23 │ *Standard Ins. Co.*, 175 F.3d 1084, 1094–95 (9th Cir. 1999).  As recounted above, the parties

24 │ agreed the matter would be resolved by cross-motions for judgment under Rule 52 based on the

25 │ record submitted to the court.  ECF No. 16 at 2.  No party requested the opportunity to prevent

26 │ live testimony.

27 │            ERISA specifically provides for judicial review of a decision to deny benefits to an

28 │ ERISA plan beneficiary.  *See* 29 U.S.C. § 1132(a)(1)(B).  It also establishes federal court

1    jurisdiction to hear such a claim. *See* 29 U.S.C. § 1132(e).  A denial of ERISA benefits "is to be

2    reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary

3    discretionary authority to determine eligibility for benefits or to construe the terms of the plan."

4    *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989); *see also Abatie*, 458 F.3d at

5    963 ("*De novo* is the default standard of review.").  If the terms of the plan grant discretionary

6    authority, a less stringent "abuse of discretion" standard is applied.  *Abatie*, 458 F.3d at 967.  "To

7    assess the applicable standard of review, the starting point is the wording of the plan."  *Id.* at 962–

8    63.

9           Here, Ms. Fowkes contends it is irrelevant whether the Plan grants discretionary

10   authority to MetLife because California law has rendered such discretionary grants "void and

11   unenforceable."  Pl.'s Mot. at 14.  She further contends because the discretionary grant is "void

12   and unenforceable," *de novo* review is proper here.  *Id.*  MetLife does not disagree.  Def.'s Mot.

13   at 19.  The court finds *de novo* review is the correct standard, as explained below.

14           2.    <u>California's Ban on Discretionary Clauses</u>

15          On January 1, 2012, California barred application of language in an employment

16   insurance plan that grants discretionary authority to the plan administrator.  Cal. Ins. Code

17   § 10110.6; *Jahn-Derian v. Metro. Life Ins. Co.*, No. 13–7221, 2016 WL 1355625, at *5 (C.D.

18   Cal. Mar. 31, 2016).  The law provides, in relevant part,

19              If a policy, contract, certificate, or agreement offered, issued,
                delivered, or renewed, whether or not in California, that provides or
20              funds life insurance or disability insurance coverage for any
                California resident contains a provision that reserves discretionary
21              authority to the insurer, or an agent of the insurer, to determine
                eligibility for benefits or coverage, to interpret the terms of the
22              policy, contract, certificate, or agreement, or to provide standards of
                interpretation or review that are inconsistent with the laws of this
23              state, that provision is void and unenforceable.

24   Cal. Ins. Code § 10110.6.  The statute defines "renewed" as "continued in force on or after the

25   policy's anniversary date."  *Id.*  A renewal of an insurance policy is significant because "[t]he law

26   in effect at the time of renewal of a policy governs the policy . . . ."  *Stephan v. Unum Life Ins.*

27   *Co. of Am.*, 697 F.3d 917, 927 (9th Cir. 2012).  "Each renewal incorporates any changes in the

28   law that occurred prior to the renewal."  *Id.*  Thus, any relevant changes in the statutory or

1    decisional law in force at the time the insurance policy is renewed "are read into each policy

2    thereunder, and become a part of the contract with full binding effect upon each party." *Id.*

3            Although the Ninth Circuit has not addressed the applicability of section 10110.6

4    to ERISA plans, several district courts have concluded *de novo* review is appropriate where

5    section 10110.6 voids plan discretionary clauses. *See, e.g.*, *Hirschkron v. Principal Life Ins. Co.*,

6    141 F. Supp. 3d 1028, 1032 (N.D. Cal. 2015) (provisions of plan with complete discretion to

7    interpret plan and determine eligibility for benefits were invalid and unenforceable under

8    California law, and, thus, plan administrator's decision denying long LTD insurance benefits to

9    plan participant was subject to *de novo*, rather than arbitrary and capricious, standard of review in

10   participant's action to recover benefits under ERISA); *Cerone v. Reliance Standard Life Ins. Co.*,

11   9 F. Supp. 3d 1145, 1152 (S.D. Cal. 2014) (same); *Curran v. United of Omaha Life Ins. Co.*,

12   38 F. Supp. 3d 1184, 1191 (S.D. Cal. 2014) (same); *Gonda v. The Permanente Med. Grp., Inc.*,

13   10 F. Supp. 3d 1091, 1095 (N.D. Cal. 2014) (same).

14           Here, the certificate date of MetLife's insurance Plan is January 1, 2011.

15   AR 2147.  This same policy was in effect in October 2014, when MetLife denied Ms. Fowkes's

16   long-term disability benefits.  AR 2137.  The policy "thus continued in force on or after the

17   policy's anniversary date." *See id.*; Cal. Ins. Code § 10110.6.  Section 10110.6 applies here and

18   voids any grant of discretion to the Plan administrator.  Accordingly, the *de novo* standard is

19   proper.

20           In employing a *de novo* standard of review, the court "simply proceeds to evaluate

21   whether the plan administrator correctly or incorrectly denied benefits." *Abatie*, 458 F.3d at 963.

22   "[T]he court does not give deference to the claim administrator's decision, but rather determines

23   in the first instance if the claimant has adequately established that he or she is disabled under the

24   terms of the plan." *Muniz v. Amec Const. Mgmt., Inc.*, 623 F.3d 1290, 1295–96 (9th Cir. 2010).

25   Before applying this standard, however, the court must first decide whether it may consider

26   Ms. Fowkes's post-appeal evidence.

27

28

1    B.    Extra-Record Evidence

2    Ms. Fowkes requests that the court to consider two pieces of evidence outside the

3    administrative record: (1) the SSA determination that Ms. Fowkes is disabled, and (2) an October

4    2014 report from social worker Maatisak S. Amenhetep, which supports a diagnosis of severe

5    post-traumatic stress disorder.  Pl.'s Mot. at 11; AR 4.  MetLife requests the court disregard this

6    evidence, contending neither the SSA determination nor the Amenhetep report was provided to

7    MetLife before it made its LTD determination.  Def.'s Evid. Obj. at 2, ECF No. 23-1.

8    When reviewing an ERISA claim, the court is ordinarily limited to the

9    administrative record before the plan administrator at the time of the claimant's benefit denial.

10    *See Abatie*, 458 F.3d at 970.  This restriction is based on the principle that federal district courts

11    should not function "as substitute plan administrators," and that expanding the record on appeal

12    "would frustrate the goal of prompt resolution of claims by the fiduciary under the ERISA

13    scheme."  *Taft v. Equitable Life Assurance Soc'y*, 9 F.3d 1469, 1472 (9th Cir. 1993) (citation

14    omitted), abrogated on other grounds by *Abatie*, 458 F.3d at 973.  Where, as here, the court

15    reviews an ERISA claim *de novo*, it can admit outside evidence "only when circumstances clearly

16    establish that additional evidence is necessary to conduct an adequate *de novo* review of the

17    benefit decision."  *Mongeluzo v. Baxter Travenol Long Term Disability Benefit Plan*, 46 F.3d

18    938, 944 (9th Cir. 1995) (citation omitted).  In most cases where review is *de novo*, "additional

19    evidence is not necessary for adequate review of the benefits decision, [and] the district court

20    should only look at the evidence that was before the plan administrator . . .  at the time of the

21    determination."  *Id.*  That "someone at a later time comes up with new evidence" does not make

22    outside review necessary.  *Id.*  Rather, the facts of the case should fit within one of the following

23    non-exhaustive "list of exceptional circumstances" to warrant consideration of materials beyond

24    the record:

25        [1] claims that require consideration of complex medical questions
        or issues regarding the credibility of medical experts; [2] the
26        availability of very limited administrative review procedures with
        little or no evidentiary record; [3] the necessity of evidence
27        regarding interpretation of the terms of the plan rather than specific
        historical facts; [4] instances where the payor and the administrator
28        are the same entity and the court is concerned about impartiality;

21

[5] claims which would have been insurance contract claims prior to ERISA; and [6] circumstances in which there is *[sic]* additional evidence that the claimant could not have presented in the administrative process.

*Opeta v. Nw. Airlines Pension Plan*, 484 F.3d 1211, 1217 (9th Cir. 2007) (citation omitted).

The *Mongeluzo* case illustrates how the court determines whether outside evidence is necessary for an adequate review of a plan decision.  In that case, the plaintiff's employer denied his claim for long term benefits, finding the plaintiff could not qualify because his conditions fell within the Plan's limitation clause, which stated in relevant part, "[p]ayment will not be made under this plan for any disability . . . for more than 24 months during your lifetime if the disability is caused by mental illness or functional nervous disorder."  *Mongeluzo*, 46 F.3d at 941.  Although the Plan did not define the terms "mental illness" and "functional nervous disorder," the plaintiff's employer, after a medical evaluation from an employer-sponsored physician, concluded the plaintiff's conditions were caused by "mental illness or functional nervous disorder," and therefore disqualified him for long-term disability benefits because no coverage was provided for such conditions under the Plan.  *Id.*

Two years after the denial, a doctor diagnosed the plaintiff with chronic fatigue syndrome and concluded the plaintiff's disability was "not caused by a mental illness or functional nervous disorder."  *Id.*  The plaintiff's employer, however, refused to consider the doctor's report or the new diagnosis.  *Id.*

The plaintiff and employer filed cross-motions for judgment in district court under ERISA.  *Id.*  In support of its motion, the plaintiff argued the "mental illness" limitation was ambiguous and needed to be construed against the drafter in evaluating the employer's benefit denial.  *Id.*  The plaintiff also argued the district court should consider the diagnosis of chronic fatigue syndrome because it had been unavailable when he became disabled, first presented a claim for disability benefits to the employer; and then appealed internally to the employer.  *Id.*  The district court declined to consider the new evidence.  *Id.*

The Ninth Circuit reversed, first holding the terms "mental disorder" or "functional nervous disorder" were ambiguous and should therefore be construed against the

1  drafter in favor of the plaintiff.  *Id.*  With ambiguities resolved in the plaintiff's favor, the Ninth

2  Circuit narrowed the definition of mental illness, concluding, "if either a cause or a symptom of

3  the disease were physical and caused the disability in whole or in part, then benefits are payable."

4  *Id.* (citing *Patterson v. Hughes Aircraft Co.*, 11 F.3d 948, 949 (9th Cir. 1993)).  In light of this

5  narrowed definition, the court held a genuine dispute of fact existed as to whether the plaintiff's

6  conditions fell within the Plan's limitation clause.  *Id.* at 943.

7           The narrowed definition also prompted the Ninth Circuit to conclude the plaintiff's

8  additional evidence was necessary to conduct an "adequate *de novo* review of the benefits

9  decision."  *Id.* at 944.  In support of its holding, the court looked to the nature of the outside

10  evidence, reasoning the chronic fatigue syndrome diagnosis was not a "new claim, but simply a

11  new explanation for [the plaintiff's disability]."  *Id.*  The court noted this "new explanation" was

12  not, and could not have been, available to the administrator prior to its decision, and the new

13  diagnosis was "part of the determination of whether physical causes or physical symptoms were

14  in whole or in part a cause" of the plaintiff's disability such that benefits should have been paid.

15  *Id.*  The Circuit reversed and remanded, "for a factual determination whether [the plaintiff]

16  suffers from a disability not caused by mental illness or functional nervous disorder," under the

17  terms of the Plan as construed by the Circuit.  *Id.*  at 944.

18           Ninth Circuit opinions subsequent to *Mongeluzo* have referenced *Mongeluzo* either

19  distinguishing it or, like it, holding review of additional evidence warranted only in exceptional

20  circumstances.  *See Kearney v. Standard Ins. Co.*, 175 F.3d 1084, 1091 (9th Cir. 1999) (additional

21  evidence could not be admitted where plaintiff could have "easily submitted  . . .  material" to

22  employer); *Opeta*, 484 F.3d at 1219 (videotape of plaintiff doing light yard work, made almost

23  two months before final disability finding, was inadmissible where employer could have, but did

24  not, submit materials to independent medical examiner); *Silver v. Exec. Car Leasing Long-Term*

25  *Disability Plan*, 466 F.3d 727, 732 n.2 (9th Cir. 2006) (SSA decision inadmissible because grant

26  of disability "merely repeat[ed] information that was already available to employer"); *Friedrich v.*

27  *Intel Corp.*, 181 F.3d 1105, 1111 (9th Cir. 1999) (additional evidence could be admitted because

28  employer prevented plaintiff from providing medical evidence to support disability claim).

1        Here, the Social Security decision is not necessary or relevant to the court's *de*

2   *novo* review.  First, while no Ninth Circuit holding explicitly speaks to the issue of whether a

3   subsequently granted SSA award should be considered, the Seventh Circuit has addressed the

4   question, persuasively.  In *Majeski v. Metro. Life Ins. Co.*, 590 F.3d 478, 483 (7th Cir. 2009), that

5   circuit opined a district court need not consider a subsequently granted SSA award in evaluating a

6   plan administrator's decision, because doing so would pose "practical problems" by effectively

7   allowing supplementation of the administrative record "without limit," and would amount to

8   reopening a "closed appeal" to consider evidence not before the administrator at the time of

9   review.  *Id.*

10       Second, while Ms. Fowkes's case is analogous to *Mongeluzo* in that the SSA

11  disability finding became available only after MetLife denied her LTD claim, her case is

12  distinguishable in that the "new evidence" is unnecessary for a full review because the definitions

13  of disability under the Plan and SSA rules are different.  *Compare* AR 2172 (to establish

14  disability under Plan, claimant must show inability to "perform with reasonable continuity the

15  [s]ubstantial and [m]aterial [a]cts necessary to pursue . . . [u]sual [o]ccupation in the usual and

16  customary way") *with Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999) (to establish

17  disability under the SSA Act, claimant must show he "suffers from a medically determinable

18  physical or mental impairment that can be expected to result in death or that has lasted or can be

19  expected to last for a continuous period of not less than twelve months").  Because the Plan's

20  definition of disability is different from the SSA definition, it is entirely plausible that

21  Ms. Fowkes is disabled under the SSA Act and not disabled under MetLife's Plan.

22       Finally, unlike in *Mongeluzo*, Ms. Fowkes does not contend MetLife's Plan is

23  ambiguous, or that MetLife erroneously defined a term in the Plan.  Ms. Fowkes merely argues

24  that under the terms of the Plan, she qualifies for LTD benefits.  The SSA award will not be

25  considered in reviewing the merits of Ms. Fowkes's ERISA claim.

26       Similarly, the Amenhetep report is not necessary to the court's *de novo* review.

27  Unlike in *Mongeluzo*, Ms. Fowkes was diagnosed with and treated for severe post-traumatic

28  stress disorder during the LTD appeals period and well before MetLife denied LTD benefits in

1    October 2014.  Ms. Fowkes does not contend MetLife or other circumstances precluded her from

2    filing treatment notes related to her condition before MetLife denied her benefits.  The

3    Amenhetep report will not be considered.

4            C.      Establishing Disability under *De Novo* Review

5            As noted above, Ms. Fowkes argues she is disabled as defined by the terms of the

6    Plan due to (1) osteoarthritis; (2) epilepsy; (3) a "heart condition"; (4) fibromyalgia; (5) migraine

7    headaches and neck pain; (6) right hand tremors; (7) memory loss; and (8) depression.  Pl.'s Mot.

8    at 9.  The Plan states Ms. Fowkes is required to provide "[w]ritten evidence satisfactory to

9    [MetLife]" for any claim for LTD benefits.   AR 2170.   Where a plan requires a claimant to

10    provide "satisfactory proof" of disability, the claimant must proffer evidence not only that she has

11    a relevant diagnosis, but also that the illness or injury precludes her from performing the tasks

12    required by her regular occupation.  *See Jordan v. Northrop Grumman Corp. Welfare Benefit*

13    *Plan*, 370 F.3d 869, 880 (9th Cir. 2004) ("That a person has a true medical diagnosis does not by

14    itself establish disability"), *overruled in part on other grounds by Abatie*, 458 F.3d at 969.

15            Ms. Fowkes does not contend the Plan's written evidence requirement violates

16    ERISA.  Instead, she takes issue with the procedures MetLife used to evaluate her LTD claim.

17    *See* Pl.'s Mot. at 17.  In particular, she contends MetLife required her to present "objective

18    evidence" in support of her LTD claim, *id.*, and argued at hearing that MetLife did not consider

19    the cumulative effect of her conditions in determining whether she adequately established

20    disability.  MetLife contends subjective reports of pain need not be taken at face value, Def.'s

21    Mot. at 23, and argued at hearing no disability is established even when considering

22    Ms. Fowkes's conditions in combination.

23            Even assuming Ms. Fowkes's contentions have merit, they do not warrant

24    judgment in Ms. Fowkes's favor at this late stage, for she does not point the court to the

25    "[w]ritten proof" needed to establish disability under the terms of the Plan.  This lack of written

26    proof provides sufficient grounds to uphold MetLife's decision to deny LTD benefits.

27            Regarding osteoarthritis, while the record shows Ms. Fowkes had throbbing pain

28    in her left knee from prolonged recovery, AR 2018, orthopedic surgeon Dr. Pereira did not

1    provide a restrictions and limitations form showing Ms. Fowkes would be precluded from

2    engaging in the tasks of her sedentary position, *id.* Further, Dr. Pereira noted her recovery would

3    occur during the eight weeks from September 4, 2013, and that Ms. Fowkes would then no longer

4    need treatment, AR 2013. In fact, the record shows she stopped seeking treatment on October 8,

5    2013, and no longer claimed disability due to her knee surgery. AR 2032. In cases in which a

6    plaintiff significantly decreases or does away with treatment for a purportedly disabling

7    condition, the plaintiff's disability claim may be undermined. *Johnson v. Shalala*, 60 F.3d 1428,

8    1434 (9th Cir. 1995). In any event, as of October 30, 2013, Ms. Fowkes no longer claimed

9    disability due to her osteoporosis. *Id.* Lastly, evidence in the record establishes Ms. Fowkes can

10   complete the tasks of her sedentary position. For example, on September 25, 2013, Dr.

11   Bukkapatnum noted Ms. Fowkes could sit, stand, and walk intermittently for one hour. AR 2026.

12   While Ms. Fowkes's position required her to work for more than one hour, Ms. Fowkes has not

13   shown or argued her job precludes her from sitting intermittently. Further, on August 13, 2013,

14   after knee replacement surgeries, Ms. Fowkes informed MetLife she could sit at a desk and

15   answer phones for short periods of time. AR 2004. Ms. Fowkes has not established disability

16   due to osteoarthritis.

17          Regarding Ms. Fowkes's claims of disability due to epilepsy, on March 31, 2014,

18   Dr. Oh noted it was unclear whether the origin of her seizures was epileptic. AR 1309. That her

19   seizures were not attributed to epilepsy was confirmed on November 1, 2013, where an EEG

20   reflected several shaking behaviors but no "electroencephalographic correlation." AR 2120.

21   Ms. Fowkes argues she was able to work until her seizure medications failed, Pl.'s Mot. at 4, but

22   does not point to a pin cite in the record supporting this claim, and the court otherwise finds no

23   support. Ms. Fowkes also has not provided evidence establishing the seizures, epileptic or not,

24   precluded her from engaging the tasks of her position.

25          Regarding her hand tremors, a March 27, 2014 examination noted Ms. Fowkes's

26   tremors were "inconsistent" with tremor appearing only with examination when, at other times,

27   she sat comfortably with no tremors apparent. AR 65. Ms. Fowkes does not point the court to

28   /////

1   evidence undermining these findings, and the court has not found evidence in the record.  *See*

2   Pl.'s Mot. at 9.  Ms. Fowkes has not established disability due to epilepsy or right hand tremors.

3      Regarding her claims of disability due to a "heart condition," primary care

4   physician Dr. Stauber noted Ms. Fowkes could sit for two hours, stand for an hour, walk for an

5   hour, and lift up to twenty pounds.  AR 57.  Although Dr. Stauber also noted Ms. Fowkes could

6   not work due to chronic pain, he did not provide restriction reports or other evidence supporting

7   this finding.  This evidence of her ability to engage in the tasks of her sedentary position was not

8   undermined by primary care physician Dr. Luke's office notes, which stated Ms. Fowkes had

9   normal coronaries but displayed evidence of diastolic dysfunction.  AR 2072.  Dr. Luke did not

10  discuss how or whether these diagnoses precluded Ms. Fowkes from performing the tasks of her

11  position as a network administrator.  *See id.*  On April 3, 2014, cardiologist Dr. Bukkapatnum

12  reported he was treating Ms. Fowkes for complex cardiovascular issues.  AR 1310.  He also

13  stated Ms. Fowkes has "severe diastolic dysfunction, orthostatic hypotension, [and] sick sinus

14  syndrome with a pacemaker."  *Id.*  But, similarly to Dr. Luke's evaluation, Dr. Bukkapatnum's

15  notes do not discuss whether these diagnoses precluded Ms. Fowkes from doing her job.  *See id.*

16  Ms. Fowkes has not established disability due to her heart conditions.

17     Regarding fibromyalgia, the record includes one report from 2011 showing

18  positive findings, but this report was made at a time Ms. Fowkes worked for VSP, and no more

19  recent clinical evidence or exam findings support a flare-up in the relevant time period.  AR 2123.

20  Similarly, Ms. Fowkes's complaints of migraines occurred while she was working for VSP,

21  suggesting the condition was not disabling.  AR 47, 60, 64.  In any event, Ms. Fowkes does not

22  point the court to evidence establishing the migraines are so debilitating that she is precluded

23  from working in her position.  *See* Pl.'s Mot. at 9.  Ms. Fowkes has not established disability due

24  to her fibromyalgia or migraines.

25     Finally, regarding her depression, Ms. Fowkes's lawyer explicitly disclaimed

26  depression as a cause of her disability on July 21, 2014, stating her depression was likely due to

27  her several physical conditions, was not disabling, was not being treated, and need not be

28  addressed on appeal.  AR 2097.  Ms. Fowkes argues her depression leaves her feeling hopeless

because of her "health, medical condition, and lack of money," Pl.'s Mot. at 9, but she does not provide any evidence establishing it precludes her from engaging in the tasks of her position.  Ms. Fowkes has not established disability due to depression.

In sum, upon *de novo* review, Ms. Fowkes has not met her burden to establish she was disabled under the terms of the Plan.

IV.     <u>CONCLUSION</u>

Ms. Fowkes's cross-motion for judgment is DENIED and MetLife's motion is GRANTED.

This order resolves ECF Nos. 19 and 20.  This case is CLOSED.

IT IS SO ORDERED.

DATED:  January 24, 2017.

_____
UNITED STATES DISTRICT JUDGE